IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PETRA PATTERSON,

     Plaintiff,

v.

HMR OF MARYLAND, LLC,

     Defendant.

Civil No. TJS-21-1333

\*     \*     \*     \*     \*     \*

**MEMORANDUM OPINION**

Pending before the Court is the Motion for Summary Judgment ("Motion") (ECF No. 38) filed by Defendant HMR of Maryland, LLC ("HMR").[1] Having considered the submissions of the parties (ECF Nos. 38, 40, 44, 46, and 51), I find that a hearing is unnecessary.[2] *See* Loc. R. 105.6. For the following reasons, the Motion will be granted.

I.    **Background**

Plaintiff Petra Patterson ("Ms. Patterson") filed this lawsuit against HMR to recover for alleged disability discrimination and retaliation. Ms. Patterson's Second Amended Complaint (ECF No. 27) is the operative pleading. Ms. Patterson asserts the following claims against HMR: discrimination in violation the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(b)(1)(A) (Count I); retaliation in violation of the ADA, 42 U.S.C. § 12203 (Count II); discrimination in violation of the Rehabilitation Act, 29 U.S.C. § 794 (Count III); and, retaliation

---

[1] In accordance with 28 U.S.C. § 636(c), all parties have voluntarily consented to have the undersigned conduct all further proceedings in this case, including trial and entry of final judgment, and conduct all post-judgment proceedings, with direct review by the Fourth Circuit Court of Appeals, if an appeal is filed. ECF No. 12.

[2] The motions to seal filed at ECF Nos. 39 and 45 will be granted. The motion for leave to exceed page limits filed at ECF No. 43 will also be granted.

in violation of the Rehabilitation Act, 29 U.S.C. § 794 (Count IV). Ms. Patterson alleges that her former employer, HMR, discriminated against her because of her disability (cancer) and retaliated against her for requesting accommodations related to her disability. All of Ms. Patterson's claims arise from her termination from employment on February 15, 2021. HMR filed its Motion after the parties had completed discovery and the Motion is ripe for decision.

## II.    Discussion

### A.    Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict for the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Yet the "mere existence of a scintilla of evidence in support of the [opposing party's] position" cannot defeat a motion for summary judgment. *Id.* at 252.

The facts themselves, and the inferences to be drawn from those facts, must be viewed in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). A party may not rest on the mere allegations or denials of its pleading but must cite "particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be

admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

### B.     Factual Background

Unless otherwise indicated, the following facts are not in dispute. *See* ECF Nos. 38-1 at 3-21 and 44 at 3-19. To the extent that any of the following facts are in dispute, they will be viewed in the light most favorable to Ms. Patterson, the non-moving party. *Scott*, 550 U.S. at 380 ("At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.").

### 1.     HMR and its Abuse Reporting Policy

HMR contracts with the State of Maryland to operate the Charlotte Hall Veterans Home in Charlotte Hall, Maryland. ECF No. 38-1 at 3. HMR receives state and federal funding to operate the facility. *Id.* As part of its contracts with the state and the Veterans Administration, HMR is required to have reporting policies in place for actual or suspected abuse. *Id.* Such policies help ensure resident safety and HMR's compliance with state and federal reporting requirements. *Id.* HMR's Abuse Reporting Policy requires that, upon receiving notice of actual or suspected abuse, HMR must take the following steps:

> (1) ensure the safety of the resident by immediately removing the suspected abuser from the vicinity of the resident (subject of the suspected abuse) and check the resident for injuries; (2) send the suspected abuser home/place on suspension, and (3) submit an Initial self-report to the state and federal authorities providing a short summary of the incident of alleged abuse within two hours of learning of/receiving notice of the alleged abuse.

*Id.* at 3-4.

For purposes of the two-hour deadline for HMR to submit an initial self-report to state and federal authorities, HMR "'learns' of an incident of suspected abuse when a member of management is informed of it," either through direct observation or through receipt of a report of

the incident from a subordinate. *Id.* at 4. Applicable members of management varied depending on the time of day. For the day and evening shifts (7:00 a.m. to 11:30 p.m., with a shift change at 3:00 p.m.), members of management included the facility Administrator, the Director of Nursing, the Assistant Director of Nursing, the Unit Manager, and the Quality Assurance Nurse. *Id.* During the night shift (11:00 p.m. to 7:30 a.m.), the "Nurse Supervisor ["Supervisor"] is the highest-ranking management official present at the facility" and is "the person solely responsible for reporting incidents of suspected abuse to the state and federal authorities." *Id.* at 5.

HMR makes compliance with its mandatory reporting requirements "as simple as possible." *Id.* Blank forms for an initial self-report of suspected abuse are provided in the Supervisor's office. *Id.* The completed forms can be submitted by email or fax. *Id.* If the form is faxed, a pre-programmed button on the fax machine automatically sends a copy of the report to the relevant state and federal officials, as well to internal HMR management. *Id.*

The two-hour deadline for HMR to submit its initial self-report of suspected abuse is triggered only once: when a member of HMR management is informed of the incident.[3] *Id.* The two-hour deadline does not reset or restart when another member of management learns about it. *Id.* If the two-hour deadline passes without submission of the initial self-report, HMR "is considered in violation of its state and federal suspected abuse reporting requirements." *Id.* The obligation to make the initial self-report of suspected abuse is the responsibility of "the supervisor who obtained the information," not anyone else. *Id.*

---

[3] Ms. Patterson disputes HMR's interpretation of its Abuse Reporting Policy. As discussed below, this dispute is immaterial because so long as HMR has interpreted its internal policy in good faith, HMR's interpretation—not the interpretation of Ms. Patterson or the Court—is what matters.

Any violation of HMR's Abuse Reporting Policy, including the two-hour reporting deadline, "directly put[s] Charlotte Hall's residents in harm's way," and " can result in HMR being found deficient by its regulating bodies." *Id.* at 5-6. This, in turn, may lead to HMR having a reduced performance rating, being subject to fines and penalties, and ultimately being barred from continuing to operate Charlotte Hall. *Id.* at 6.

Once the initial self-report is submitted, HMR has five days to complete a more thorough investigation of the suspected abuse and send a report of its findings to the state and federal regulatory bodies. *Id.*

It is HMR's practice "to report all incidents of questionable conduct—even if only mildly questionable—to the regulatory bodies as suspected abuse," even if the member of management making the report "questions the veracity or severity of the incident." *Id.* HMR trains it staff to follow this practice. *Id.*

HMR's Abuse Reporting Policy includes "isolation of resident" and "involuntary seclusion" within its definition of suspected or actual abuse. *Id.* 6-7. Accordingly, under HMR's policy, any alleged incident involving the isolation of a resident or the involuntary seclusion of a resident must be reported to state and federal authorities no later than two hours after the first member of HMR's management becomes aware of the incident.

### 2.    Ms. Patterson's Employment at HMR

Ms. Patterson began working at HMR in November 2014. *Id.* at 7. At all relevant times, Ms. Patterson's immediate supervisor was Jiemiere Smith ("Ms. Smith"), who was then the Director of Nursing. *Id.* Administrator Russell Keogler ("Mr. Keogler")[4] was Ms. Patterson's

---

[4] Mr. Keogler's name is sometimes referenced as "Mr. Koegler" in Ms. Patterson's brief and in exhibits attached to HMR's Motion. The Court will spell Mr. Keogler's name the way that HMR has spelled it in its brief.

second-level supervisor. *Id.* Ms. Patterson's assigned schedule was to work double shifts on Saturday and Sunday evenings and nights (3:00 p.m. until 7:00 a.m.), and every other Tuesday. *Id.* When Ms. Patterson worked day or evening shifts, she most often worked in the Charge Nurse role. *Id.* When working the night shift, "she was almost always the Supervisor, the highest ranking member of management present at the *entire* facility during that shift." *Id.* When working as the Supervisor on the night shift, Ms. Patterson was "the sole person responsible for submitting any reports of suspected abuse that may arise to the state and federal regulatory agencies." *Id.* at 8.

Around July 2020, Ms. Patterson was diagnosed with endometriosis and uterine cancer. *Id.* at 8. She underwent a total hysterectomy followed by a course of chemotherapy. *Id.* Ms. Patterson informed Ms. Smith of her diagnosis and expected course of treatment. *Id.* Mr. Keogler and Adrienne Jones, the Assistant Director of Nursing, also learned of Ms. Patterson's diagnosis and treatment plan. *Id.* Ms. Patterson requested, and was granted, four weeks of protected medical leave for her hysterectomy and recovery, from September 3, 2020, through October 4, 2020. *Id.* To make this request, Ms. Patterson worked with HMR's Human Resources Assistant, Dominique Thomas ("Ms. Thomas"). *Id.* Prior to 2020, Ms. Patterson had taken other protected medical leave. *Id.* at 8-9.

After Ms. Patterson's 2020 surgery, she scheduled appointments for chemotherapy on these dates:

- Wednesday, October 21, 2020
- Wednesday, November 18, 2020
- Monday, December 7, 2020
- Monday, December 28, 2020
- Monday, January 18, 2021
- Monday, February 8, 2021

*Id.* at 9.

Ms. Patterson provided her chemotherapy appointment schedule to Ms. Thomas and Audrey Chase ("Ms. Chase"), two non-management-level employees of HMR. *Id.* Ms. Patterson had no scheduling conflicts or difficulty arriving on time for her chemotherapy appointments on October 21, November 18, and December 7, 2020. *Id.* On December 28, 2020, Ms. Patterson did not clock out of work until 9:45 a.m., more than two hours after her normal departure time. *Id.* The reasons for her late departure are unclear. *Id.* In any case, Ms. Patterson managed to attend her scheduled chemotherapy appointment that day. *Id.*

During her deposition, Ms. Patterson recalled struggling to obtain coverage so that she could leave her shift early for her chemotherapy appointments on January 18, 2021, and February 8, 2021. *Id.* at 10. But on January 18, 2021, Ms. Patterson clocked out of her shift a little early (7:08 a.m. instead of 7:30 a.m.), so perhaps she misremembered having trouble on that date. *Id.* On February 8, 2021, Ms. Patterson clocked out of her shift at 8:00 a.m., 30 minutes later than scheduled. *Id.* According to Ms. Patterson, she was not originally scheduled to work the evening and night shifts on February 7-8, 2021, but agreed to do so at Ms. Chase's request. *Id.* The parties agree that Ms. Patterson had been free to decline Ms. Chase's request for her to work these shifts. *Id.* Ms. Patterson obtained all of her chemotherapy treatment as scheduled, never missing an appointment because she had to clock out of work late. *Id.* Ms. Patterson never spoke to Mr. Keogler, Ms. Smith, or Ms. Jones about any concerns she had about obtaining adequate shift coverage so that she could leave for her chemotherapy appointments on time. *Id.* And Mr. Keogler, Ms. Smith, and Mr. Jones never made any "negative or derogatory comments to Ms. Patterson regarding her cancer diagnosis, her need to take medical leave for surgery, or her chemotherapy treatments." *Id.* at 11.

### 3.    Ms. Patterson's Failure to Report Suspected Abuse

By February 2021, Ms. Patterson was familiar with HMR's Abuse Reporting Policy because she had worked for HMR since 2014 and attended "suspected abuse training at the beginning of her employment and annually thereafter." *Id.* at 11. Ms. Patterson took another abuse training on January 8, 2021. *Id.* Besides having been trained on the reporting of abuse, Ms. Patterson had actually handled "four, maybe five" cases of suspected abuse during her employment. *Id.* And she had submitted at least one initial self-report to state and federal authorities. *Id.*

As the night shift supervisor for the 11:00 p.m. to 7:00 a.m. shift that ran from Sunday, February 7, 2021, to Monday, February 8, 2021, Ms. Patterson was "the most senior management official on site . . . and solely responsible for reporting instances of alleged abuse that might occur" during her shift to state and federal authorities. *Id.*

At 12:40 a.m. on Monday, February 8, 2021, Agnes Dandridge ("Ms. Dandridge"), a geriatric nursing assistant, "engaged in inappropriate conduct toward a resident 'Ms. L,' of Unit 2C." *Id.* at 12. Ms. Dandridge "forced 'Ms. L' into a chair behind the nurse's station and blocked her from leaving that area by using a chart cart." *Id.* Ashley King ("Ms. King"), a Charge Nurse working as a contractor or agency nurse at Charlotte Hall, observed Ms. Dandridge's interaction with Ms. L. *Id.*

Sometime between 2:00 a.m. and 3:00 a.m., or perhaps later (the exact time is in dispute, *see* ECF No. 44 at 3-5), Ms. King left unit 2C and went up to Unit 3C, where Ms. Patterson was working. ECF No. 38-1 at 12. Ms. King told Ms. Patterson that she had seen Ms. Dandridge restrict Ms. L from freely walking around the unit, sat Ms. L in a chair behind the nursing station, and kept her in place using a chart cart. *Id.* Ms. King said that when Ms. L attempted to leave the

nursing station area, Ms. Dandridge "pulled [Ms. L] away aggressively and put her in the chair." *Id.* Ms. Patterson suggests that HMR overdramatizes the gravity of the incident as it was relayed to her from Ms. King. ECF No. 44 at 5-6. Ms. Patterson argues that given the casual way that Ms. King had reported the incident, and considering Ms. King's relative lack of experience, Ms. Patterson did not actually suspect (and had no reason to suspect) that abuse had taken place. *Id.*

The restriction of voluntary movement of a resident "is included in the training materials as a textbook definition of abusive conduct." ECF No. 38-1 at 12. Ms. Patterson failed to "initiate HMR's Abuse Reporting Policy." *Id.* at 12-13. She failed to "immediately proceed to Unit 2C to ensure the safety and security of 'Ms. L' by suspending Ms. Dandridge and sending her home." *Id.* at 13. And she "did not prepare or submit an initial self-report documenting the suspected abuse to the appropriate state or federal regulatory bodies." *Id.*

Instead, Ms. Patterson questioned Ms. King "about the severity of the restricting, as it is not uncommon for staff to redirect residents by hand/arm" or to keep residents behind the nurses' station when the resident is wandering into other rooms. ECF No. 40-7 at 5 (under seal). Ms. Patterson "told [Ms. King] if there is an aggressive form of restraining a resident, she need[ed] to inform [Ms. Patterson] immediately and write a statement." *Id.* Ms. Patterson explained that if Ms. King gave her a written statement, Ms. Patterson would submit it to Ms. Smith later in the morning. *Id.* After that, Ms. King never called or made additional complaints to Ms. Patterson. *Id.*

Based on HMR's Abuse Reporting Policy, Ms. Patterson was required to submit an initial self-report of abuse to the state and federal authorities within two hours of when she received the report of suspected abuse. Regardless of when Ms. King made this report—2:00 a.m., 3:00 a.m., or even 4:00 a.m.—there is no genuine dispute that Ms. Patterson failed to submit a timely self-report of suspected abuse, in violation of HMR's policy. And in further violation of the policy,

Ms. Patterson failed to dismiss Ms. Dandridge for the rest of her shift, to separate Ms. Dandridge from Ms. L, and to ensure that Ms. L was safe.

At around 6:00 a.m. on February 8, 2021, Ms. Jones arrived at HMR to conduct the weekly COVID-19 testing for the night-shift employees before they clocked out. ECF No. 38-1 at 13. Around 6:30 a.m., Ms. Jones arrived on Unit 2C, where Ms. King had observed Ms. Dandridge abusing Ms. L. *Id.* at 14. Ms. King told Ms. Jones about what she saw Ms. Dandridge do to Ms. L. *Id.* Ms. Jones concluded that a "reportable incident of suspected abuse had likely occurred between Ms. Dandridge and 'Ms. L.'" *Id.* Ms. Jones also determined that the "two-hour reporting window had already passed" by the time she learned of the incident. *Id.*

After speaking with Ms. King about Ms. Dandridge's abuse of Ms. L, Ms. Jones went to Unit 3C to find Ms. Patterson. *Id.* Ms. Jones found Ms. Patterson around 7:00 a.m., and asked her about what had happened "four-to-five hours earlier that morning." *Id.* Ms. Patterson told Ms. Jones (1) that Ms. King had reported the incident to her, (2) that Ms. Patterson had not submitted an initial self-report to the state and federal authorities; and (3) that Ms. Patterson had not called Ms. Smith for further instructions. *Id.* Ms. Jones asked Ms. Patterson to provide a witness statement of the events. *Id.* Ms. Patterson agreed to provide such a statement, but stated that she would provide it to Ms. Smith after she had returned to HMR for her next shift. Ms. Patterson had to leave HMR for her chemotherapy appointment, but she did not complain to Ms. Jones about not being relieved earlier, and Ms. Jones did not comment on Ms. Patterson's need to leave work for chemotherapy. *Id.* at 14-15. After speaking with Ms. Patterson, Ms. Jones attempted to locate Ms. Dandridge on Unit 2C, but found that Ms. Dandridge had left at the end of her shift. *Id.* at 15.

### 4.       Investigation of Ms. Patterson's  Failure to Report Suspected Abuse

Ms. Smith arrived at HMR between 7:00 a.m. and 8:00 a.m. on February 8, 2021. *Id.* at 15. When she entered her office, she found a written statement from Ms. King on the floor. *Id.* Around this time, Ms. Jones came to Ms. Smith's office and reported what had taken place that morning, including what Ms. King had told her about the abuse of Ms. L. *Id.* Ms. Smith and Ms. Jones were both confused about Ms. Patterson's handling of the abuse of Ms. L. *Id.* After reading Ms. King's statement, Ms. Smith concluded that the abuse of Ms. L. should have been reported. *Id.* Ms. Smith checked her email to confirm that she had not overlooked Ms. Patterson's initial self-report of abuse but found that she had not. *Id.* at 16. Ms. Smith went to the office that Ms. Patterson shared with other supervisors to see if any initial self-report had been submitted or left behind, but she found nothing. *Id.* Ms. Smith asked a person who shared the office with Ms. Patterson if Ms. Patterson had left a report. *Id.* That person replied that Ms. Patterson planned to write a report when she returned to work. *Id.*

Ms. Jones and Ms. Smith concluded that Ms. Patterson had not submitted the required report to the regulatory authorities, in violation of HMR's Abuse Reporting Policy. *Id.* They told Ms. Keogler of the incident of abuse and of Ms. Patterson's failure to submit a report. *Id.* Ms. Jones, Ms. Smith, and Mr. Keogler were all confused by Ms. Patterson's conduct. *Id.* They considered "Ms. Patterson a trusted employee who knew the Abuse Reporting Policy well [and] who had just undergone a refresher training the month before." *Id.* And when she described the incident to Ms. Jones, Ms. Patterson used words like "aggressive" and "violence," words that "indicated that this was [] serious enough to rise to the level of suspected abuse." *Id.* Still, Ms. Patterson did not take the steps required by HMR's policy "to secure the safety of 'Ms. L' [and] submit an initial self-report to the applicable regulatory agencies." *Id.* Because they could not

reconcile Ms. Patterson's failure to report the abuse with her past conduct and training, Ms. Jones, Ms. Smith, and Mr. Keogler "wondered if they were missing some information." *Id.* at 16-17. Neither Ms. Jones, Ms. Smith, nor Mr. Keogler submitted a report of the abuse of Ms. L when they first learned of the abuse on the morning of February 8, 2021. *See* ECF No. 44 at 11.

Mr. Keogler directed Ms. Jones and Ms. Smith "to gather more information to determine what had transpired and whether Ms. Patterson had failed to act on a reportable incident." ECF No. 38-1 at 17. Ms. Jones and Ms. Smith reviewed the security footage of Unit 2C from earlier that morning. *Id.* The footage "confirmed their fears" that abuse had occurred, and that the relevant policies and regulations had not been followed. *Id.* Based on the investigation conducted by Ms. Jones and Ms. Smith, HMR concluded that multiple failures had occurred. *Id.* Ms. Dandridge had committed an act of abuse at 12:40 a.m. *Id.* And Ms. King had failed to respond to the abuse in accordance with HMR's policy, in that she (1) failed to immediately remove Ms. Dandridge from the unit and suspend her; (2) failed to immediately telephone Ms. Patterson about the abuse, rather than waiting to tell her around 2:00 or 3:00 a.m.; and (3) exposed Ms. L to further harm by leaving her alone on the unit with Ms. Dandridge when she went to find Ms. Patterson. *Id.* at 17-18.

Before 2:53 p.m. on February 8, 2021, Ms. Jones prepared a draft initial self-report and circulated it internally for review. *Id.* at 18. Ms. Jones finalized and submitted the initial self-report of actual abuse to state and federal authorities at 3:08 p.m. *Id.* The same day, HMR suspended Ms. Dandridge pending its investigation of the incident. *Id.* HMR also notified the staffing agency that employed Ms. King that she must be removed from the contracted staff sent to HMR, and revoked Ms. King's privileges. *Id.* at 18-19. HMR did not immediately act to discipline or terminate Ms. Patterson. *Id.* at 19.

### 5.     HMR's Decision to Terminate Ms. Patterson

Ms. Patterson reported to work at 10:26 p.m. on February 8, 2021. *Id.* Although she was about 30 minutes early for her shift, Ms. Patterson did not use the time to draft a written statement about the incident between Ms. Dandridge and Ms. L. *Id.* Instead, "Ms. Patterson waited until the end of that night's shift (the morning of February 9, 2021) to draft a witness statement, and only did so at Ms. Smith's request." *Id.* Ms. Patterson clocked out at 7:30 a.m. on February 9, 2021. *Id.*

Upon review of Ms. Patterson's written statement (and with the benefit of the investigation conducted by HMR employees, including the surveillance footage and the information obtained from Ms. Dandridge and Ms. King), Mr. Keogler determined that "Ms. King's statements and written report to Ms. Patterson were sufficient to put Ms. Patterson" on notice that suspected abuse had occurred, thereby triggering HMR's Abuse Reporting Policy. *Id.* at 19-20. "With the input of HMR Veterans Services, Inc. personnel and of Ms. Smith and Ms. Jones," Mr. Keogler suspended Ms. Patterson on February 9, 2021, pending the outcome of the investigation of the incident. *Id.* at 10. HMR concluded its investigation and submitted its final report to state and federal regulatory bodies on February 12, 2021. *Id.*

HMR determined that Ms. Patterson had violated HMR's policy (and applicable state and federal regulations) on suspected abuse. *Id.* Ms. Patterson disputes that she violated HMR's policy and any applicable regulations. ECF No. 44 at 14-15. All the same, it is undisputed that HMR found that Ms. Patterson violated its policy "by failing to secure the safety of 'Ms. L,' by not immediately suspending and sending [Ms.] Dandridge home, and by not preparing and submitting an initial self-report for the state and federal regulatory bodies within two hours of learning of the incident." *Id.* at 20. In light of the violations that HMR found, Mr. Keogler determined it appropriate to terminate Ms. Patterson's employment. *Id.*

On February 12, 2021, Ms. Patterson returned to HMR at Ms. Smith's request to discuss the conclusions of HMR's investigation. *Id.* at 21. During their meeting, Ms. Smith informed Ms. Patterson that she was being terminated for her violation of HMR's Abuse Reporting Policy. *Id.* Ms. Patterson appealed her termination on February 23, 2021, as permitted by HMR's internal grievance procedures. *Id.* This lawsuit followed.

### C.    Discrimination Claims

HMR argues that it is entitled to summary judgment on Ms. Patterson's discriminations claims under the ADA (Count I) and the Rehabilitation Act (Count III) because Ms. Patterson cannot create a genuine dispute of material fact that the reason HMR has proffered for its termination of her employment was mere pretext. ECF No. 38-1 at 23-31. Ms. Patterson concedes that she cannot prevail on her discrimination claim brought under the Rehabilitation Act (Count III) because "she cannot meet the 'sole cause' causation standard required under the Rehabilitation Act." ECF No. 44 at 2. Ms. Patterson opposes HMR's Motion as to her ADA discrimination claim (Count I). *Id.* at 2-3.

"To establish a claim for disability discrimination under the ADA, a plaintiff must prove '(1) that she has a disability, (2) that she is a 'qualified individual' for the employment in question, and (3) that [her employer] discharged her (or took other adverse employment action) because of her disability.'" *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015) (quoting *EEOC v. Stowe–Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000)). In the context of an ADA discrimination claim, the "but for" standard is used to assess causation. *Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 235 (4th Cir. 2016).

Under the ADA, "[d]isability discrimination may be proven through direct and indirect evidence or through the *McDonnell Douglas* burden-shifting framework." *Jacobs*, 780 F.3d at 572.

In this case, Ms. Patterson proceeds under the *McDonnell Douglas* burden-shifting method. ECF No. 44 at 32. Under this framework, Ms. Patterson has the initial burden of establishing a prima facie case of discrimination.

Because HMR concedes (for this Motion) that Ms. Patterson is a qualified individual with a disability under the ADA and the Rehabilitation Act, *see* ECF No. 38-1 at 23 n.6, the only element of Ms. Patterson's ADA claim in dispute is whether she was terminated because of her disability. As explained above, HMR states that it terminated Ms. Patterson "because she failed to comply with state and federal regulations embodied in HMR's Abuse Reporting Policy" during her February 7-8, 2021, shift. ECF No. 38-1 at 24-25. This is a nondiscriminatory reason for the termination of Ms. Patterson's employment. Because HMR has proffered a legitimate reason for Ms. Patterson's termination, the Court need not examine whether Ms. Patterson has made a prima facie case of discrimination. Instead, the Court will presume that Ms. Patterson has made a prima facie case of discrimination and proceed to the ultimate question of whether Ms. Patterson has created a genuine issue of material fact about whether HMR's proffered reason is pretextual such that the case should proceed to a jury to determine whether discrimination was the real reason for her termination. *See Equal Emp. Opportunity Comm'n v. Manufacturers & Traders Tr. Co.*, 429 F. Supp. 3d 89, 121 (D. Md. 2019) (Hollander, J.) (explaining that when an employer has proffered a purportedly nondiscriminatory reason for an adverse employment action, the district court must resolve "one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of [a protected classification]?" (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008)).

Ms. Patterson argues that there is a genuine dispute about whether HMR's stated reason for her termination is pretextual and that discrimination was the real reason for the termination. She relies mainly on comparator evidence, arguing that Ms. Jones and Ms. Patterson are comparators, and that HMR treated them differently when the only difference between them was Ms. Patterson's disability. ECF No. 44 at 31-34. When, as here, a plaintiff relies on comparator evidence to show discriminatory animus, the plaintiff "must put forward comparators who are 'similar in all relevant respects.'" *Kande v. Luminis Health Doctors Cmty. Medical Center, Inc.*, No. PX-21-1262, 2023 WL 2478931, at *6 (D. Md. Mar. 13, 2023) (quoting *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010)). "This typically means that the plaintiff and identified comparators shared 'the same supervisor, [were] subject to the same standards, and engaged in the same conduct' but with disparate outcomes to the plaintiff's disadvantage." *Id.*

In many ways, Ms. Jones and Ms. Patterson are similar. *See* ECF No. 44 at 32. Both worked in supervisory nursing roles over a long time, both had similar job duties, both were subject to the same Abuse Reporting Policy at HMR, and both were supervised by Ms. Smith and Mr. Keogler. *Id.* But there is a critical distinction between Ms. Jones and Ms. Patterson: Ms. Jones did not violate HMR's Abuse Reporting Policy on February 8, 2021. Because Ms. Jones did not engage in the same misconduct as Ms. Patterson, she is not a valid comparator.

Ms. Patterson attempts to circumvent this crucial distinction between her and Ms. Jones by arguing that Ms. Jones did, in fact, violate HMR's Abuse Reporting Policy. Because this argument is based on conjecture and a misstatement of the applicable law, the Court rejects it. What matters in determining whether an individual violated HMR's Abuse Reporting Policy is the judgment of HMR. The view of Ms. Patterson and her counsel is immaterial.

In the analogous context of a Title VII claim, the Fourth Circuit has explained that anti-discrimination laws are "not a vehicle for substituting the judgment of a court for that of the employer." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298-99 (4th Cir. 1998). The Court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *Id.* (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)). Instead, the Court's "sole concern" is determining "whether the reason for which the defendant discharged the plaintiff was discriminatory." *Id.* It is not the Court's "province to decide" whether an employer's articulated reason for termination "was wise fair, or even correct, ultimately, so long as it truly was the reason for plaintiff's termination." *Id.* To this end, "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Id.* (internal quotation marks omitted).

Even if an employer makes a mistake in its termination decision, like terminating an employee for misconduct that the employee did not actually commit or by improperly judging what constitutes misconduct in the first place, this is not a basis for the Court to second-guess the employer's decision. *Villa v CavaMezze Grill, LLC*, 858 F.3d 896, 903 (4th Cir. 2017) ("If Villa was fired for misconduct she did not actually engage in, that is unfortunate, but a good-faith factual mistake is not the stuff of which Title VII violations are made."). So long as the employer made its termination decision "because of a good faith belief" that the employee engaged in misconduct, it will not be liable for discrimination. *Id.*

Ms. Patterson challenges HMR's decision to terminate her for violating the Abuse Reporting Policy. But even if HMR misinterpreted its own policy (there is no evidence that this is the case; HMR's interpretation of the meaning of the "2 hour deadline" in its policy tracks with federal law, *see* ECF No. 51 at 7 (citing 42 C.F.R. § 483.12(c)), Ms. Patterson has not created a

genuine dispute of fact that HMR did not act in good faith in deciding to terminate her. To put a finer point on it, even if HMR wrongly concluded (1) that Ms. Patterson was on notice of suspected abuse from Ms. King's report; (2) that Ms. King made her report sometime between 2:00 a.m. and 3:00 a.m. on February 8, 2021; and (3) that Ms. Patterson had not satisfied her reporting obligations by notifying Ms. Jones of the suspected abuse when she arrived for her shift, there is no evidence that HMR made these errors in bad faith or as a ruse for discriminating against Ms. Patterson because of her disability. Ms. Patterson criticizes HMR's investigation of the events on February 8, 2021, and argues that HMR's termination decision was based on the benefit of hindsight and video surveillance footage, which Ms. Patterson did not have at the relevant time. But the evidence is uncontroverted that HMR endeavored to conduct a thorough investigation into the suspected abuse of Ms. L on February 8, 2021. At the end of this investigation, HMR determined that Ms. Patterson (along with two others) must face adverse employment action for their violation of HMR's policies. With respect to Ms. Patterson, HMR determined that she violated the Abuse Reporting Policy by, among other things, not reporting suspected abuse within 2 hours of when the allegation of suspected abuse was raised by Ms. King.

Returning to Ms. Patterson's comparator argument, the same analysis applies. First, there is no evidence to put in dispute HMR's good-faith determination that Ms. Jones did not violate its Abuse Reporting Policy. Because the 2-hour reporting deadline had passed by the time that Ms. Jones learned of the suspected abuse, it would have been impossible for her to violate HMR's 2-hour reporting policy. Second, even if HMR was somehow mistaken on this point, Ms. Patterson has not proffered any evidence that HMR was not acting in good faith. The uncontroverted evidence is that HMR determined, in good faith, that Ms. Patterson violated the Abuse Reporting

Policy and that Ms. Jones did not. Accordingly, that HMR treated Ms. Jones differently than Ms. Patterson does nothing to advance Ms. Patterson's claim of HMR's discriminatory animus.

Ms. Patterson cites other evidence that she believes demonstrates HMR's discriminatory animus, such that her discrimination claim should proceed before a jury. She points to a statement that Ms. Jones allegedly made during the termination meeting. ECF No. 44 at 32 (stating that Ms. Jones told Ms. Patterson that she "should have taken better care of [her]self" in response to Ms. Patterson asking whether she was being terminated because of her cancer). Although Ms. Jones and Ms. Smith (the other attendees at the termination meeting) denied that Ms. Jones made this statement, and although Ms. Patterson did not mention this statement in her interrogatory responses or in her February 23, 2021, internal grievance letter about her termination, the Court must view the facts in the light most favorable to Ms. Patterson and assume that Ms. Jones did make this statement. But even considering this ambiguous statement, in the context of all the evidence here, no reasonable juror could conclude that the statement provides sufficient evidence that HMR's termination decision was pretextual or that its decision was based on discriminatory animus.

The same goes for Ms. Patterson's argument that a "long factual record" exists to show that "Mr. Patterson's cancer diagnosis was becoming burdensome to HMR." ECF No. 44 at 38. To begin with, Ms. Patterson's "long factual record" is unsupported by any citation to evidence that would support her argument. *See id.* (containing no citation to evidence in the record). And the evidence that Ms. Patterson appears to rely on comes from her own deposition. *See id.* at 27-28. While Ms. Patterson may believe that HMR found it burdensome to accommodate her cancer diagnosis and treatment, the self-serving evidence she cites is not enough to create a genuine dispute of fact as to whether HMR's stated reason for her termination was pretextual or that its real reason for the termination was discriminatory. *See Bryant v. Bell Atl. Maryland, Inc.*, 288 F.3d

124, 135 (4th Cir. 2002) (explaining that evidence of subjective beliefs of discriminatory animus "is insufficient to create a genuine issue of material fact as to any discriminatory conduct [an employer's] part" (citing *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995) (unsupported speculation insufficient to defeat summary judgment)). Because Ms. Patterson has failed to generate a material dispute of fact on whether HMR's stated reason for her termination is pretextual and that its real reason for her termination was discrimination, HMR is entitled to summary judgment on the ADA discrimination claim.[5]

### D.    Retaliation Claims

HMR argues that it is entitled to summary judgment Ms. Patterson's claims for retaliation in violation of the ADA (Count II) and in violation of the Rehabilitation Act (Count IV) because no reasonable jury could find in her favor on these claims. ECF No. 38-1 at 31-34. Under both laws, to make a prima facie case Ms. Patterson must prove (1) that she engaged in protected conduct; (2) that she suffered an adverse action after engaging in the protected conduct; and (3) that there was a causal link between the protected conduct and the adverse action. *See Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006); *Perry v. Computer Sci. Corp.*, 492 F. App'x 218, 220 (4th Cir. 2011); *see also Gentry v. E.W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 235-36 (4th Cir. 2016) (explaining that ultimately the "but for" causation standard applies to ADA claims); *Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014) (applying the "but for" causation standard to retaliation claims under the ADA and the Rehabilitation Act). Ms. Patterson proceeds under the *McDonnell Douglas* framework for her retaliation claims. ECF No. 44 at 32-33. HMR concedes (for this Motion), that Ms. Patterson engaged in protected activity under the ADA and

---

[5] Because Ms. Patterson concedes that she cannot prevail on her Rehabilitation Act discrimination claim (Count III), the Court will also enter judgment in favor of HMR on this claim.

the Rehabilitation Act, *see* ECF No. 38-1 at 31 n.10. And there is no dispute that Ms. Patterson's termination occurred after she engaged in protected activity, and that her termination counts as an adverse action. Because HMR has advanced a legitimate, non-retaliatory reason for its termination of Ms. Patterson (her violation of the Abuse Reporting Policy), all that is left to consider is whether there is any genuine dispute of material fact as to why HMR terminated Ms. Patterson. *See Hannah P. v. Coats*, 916 F.3d 327, 347 (4th Cir. 2019). If Ms. Patterson cannot create a genuine dispute of fact as to whether HMR's "explanation was false and a pretext for retaliation," HMR will be entitled to summary judgment on the retaliation claims. *Fry v. Rand Constr. Corp.*, 964 F.3d 239, 245 (4th Cir. 2020) (citing *Foster v. University of Maryland-Eastern Shore*, 787 F.3d 243, 252 (4th Cir. 2015); *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318–20 (4th Cir. 2005)).

HMR argues that Ms. Patterson's retaliation claims fail because there is no evidence that any of the decision-makers involved in the termination decision (Mr. Keogler, Ms. Smith, and Ms. Jones) "knew of any of Ms. Patterson's purported protected activity." ECF No. 38-1 at 32 (citing *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021) ("To establish a causal relationship between the protected activity and the termination, a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred.")); *Smith v. CSRA*, 12 F.4th 396, 420 (4th Cir. 2021) (explaining that because "an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary" to prove a retaliation claim). HMR states that Ms. Patterson "provided her chemotherapy schedule only to Ms. Thomas and Ms. Chase,

neither of whom are members of HMR management . . ., and neither of whom played any role" in the decision to terminate Ms. Patterson.[6] *Id.* at 33.

 HMR also argues that Ms. Patterson cannot rely solely on the close temporal proximity between her chemotherapy appointments in January and February 2021 and her termination on February 15, 2021. *Id.*; *see Allen v. Wormuth*, No. LMB-22-603, 2023 WL 1767009, at *13 (E.D. Va. Feb. 2, 2023) ("Although temporal proximity alone may establish causation at the prima facie stage, it cannot, without additional record evidence, satisfy the more 'onerous' burden that plaintiff's protected activity was the "but for" cause of her removal from the contract." (citing *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011)).

 Ms. Patterson argues that there is no dispute that she engaged in protected activity "when she requested medical accommodations including *inter alia* leave to obtain chemotherapy treatment . . . on January 18, 2021 and February 8, 2021." ECF No. 44 at 33. Ms. Patterson points to the close temporal proximity between Ms. Patterson's last chemotherapy appointments and her termination. *Id.* While Ms. Patterson is correct that close temporal proximity alone may be sufficient to establish a causal connection between an employee's protected activity and an employer's adverse action, at least at the prima facie stage, the real question before the Court is whether there is an actual dispute about the reason that HMR terminated Ms. Patterson.

 There is simply no evidence that HMR terminated Ms. Patterson out of retaliatory animus. Ms. Patterson does not address HMR's argument that the responsible decision-makers were not aware of her protected activity. Indeed, HMR cites Ms. Patterson's own deposition testimony to show that they were not aware, as well as Ms. Patterson's agreement to paragraph 41 of HMR's

---

[6] Ms. Patterson apparently also complained to Ms. Chase about the lack of shift coverage on the dates of her appointments. *Id.*

statement of undisputed material facts. ECF No. 51 at 17 (citing ECF Nos. 38-1 at 10 & 38-4 at 39-40, 54-56). If the decisionmakers behind the termination decision were unaware of Ms. Patterson's protected activity, there is no possible causal connection between the termination and the protected activity.

And Ms. Patterson has cited no evidence to suggest that HMR's proffered reason for the termination—Ms. Patterson's violation of the Abuse Reporting Policy—is a pretext for retaliation. None of the evidence that Ms. Patterson cites—Ms. Patterson's subjective beliefs about how Ms. Jones and Ms. Chase felt about her request for shift coverage, Ms. Jones' comment during the termination meeting that Ms. Patterson should have taken better care of herself—even taken together with the close temporal proximity between the protected activity and Ms. Patterson's termination, would be sufficient for a reasonable jury to find that HMR retaliated against Ms. Patterson. *See Iwebo v. Sheppard Pratt Health Sys., Inc.*, No. BPG-19-3008, 2022 WL 3681956, at *9 (D. Md. Aug. 24, 2022) ("In cases in which the court has denied summary judgment at the pretext stage of the *McDonnell Douglas* framework, there has been a specific proffer of evidence of pretext in addition to evidence of close temporal proximity." (citing *Foster*, 787 F.3d at 253-54 (holding that a reasonable jury could conclude that defendant's proffered non-retaliatory reasons for terminating plaintiff were pretextual based on conflicting deposition testimony, evidence of plaintiff's adequate work performance, and defendant's failure to initially provide a reason for terminating plaintiff); *Harris v. Wormuth*, No. JKB-18-3562, 2022 WL 899953, at *6-9 (D. Md. Mar. 28, 2022) (denying summary judgment on the issue of pretext based on deposition testimony which contradicted defendant's explanations for plaintiff's termination and because of defendant's "inconsistent explanations" regarding plaintiff's conduct, as well as circumstantial evidence negating defendant's justifications)). HMR is entitled to summary judgment on Ms. Patterson's

retaliation claims because Ms. Patterson has failed to generate any dispute of material fact on the issue of causation that would require this case to be decided by a jury.

## III.    Conclusion

For the reasons stated above, HMR's Motion for Summary Judgment (ECF No. 38) will be granted, and judgment will be entered in favor of HMR. A separate order follows.


Date:   March 20, 2023                          _____/s/_____
                                                Timothy J. Sullivan
                                                United States Magistrate Judge